**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| FREDILITO TUMBAGA, EVAN TUMBAGA, JADEN TUMBAGA, and JUSTIN TUMBAGA BY EVAN TUMBAGA, his parent, | |
| Plaintiffs, | **MEMORANDUM OF DECISION** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | Case No. 3:06-cv-00247-SLG |

## I.  INTRODUCTION

This is a medical malpractice action brought against the United States pursuant to the Federal Tort Claims Act.[1]  The Complaint was filed in October 2006,[2] and relates to medical care that was provided to plaintiff Fredilito Tumbaga at the Alaska Native Medical Center (ANMC) in October and November of 2004.   Evan Tumbaga is Mr. Tumbaga's spouse, and Justin and Jayden Tumbaga are the Tumbagas' children.  The Tumbagas seek to recover past medical expenses, future life care expenses, past and future lost earnings, and past and future non-economic damages.[3]  Pursuant to the Federal Tort Claims Act, the law of the forum state applies to this claim, including

---

[1] 28 U.S.C. § 2671 *et seq.*

[2] Docket 1.

[3] Docket 209 at 26.

Alaska Statute § 09.55.540, which sets out the elements for a medical malpractice claim.[4]

This matter was assigned to the undersigned judge in January 2012. A seven-day bench trial was held in early April 2012. The parties each filed proposed Findings of Fact and Conclusions of Law on April 16, 2012.[5]

Federal Rule of Civil Procedure 52(a) provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusion of law separately." Having considered the testimony of the witnesses, the exhibits admitted into evidence, and the parties' submissions, this court now makes the following Findings of Fact and Conclusions of Law as set forth below.[6]

## II. FINDINGS OF FACT

### *The Evidence Presented at Trial.*

1.    A total of nineteen witnesses testified at trial, including two witnesses by videotaped deposition.[7]

2.    Each of the Tumbagas testified at trial. The plaintiffs also called the following individuals as witnesses: Dr. John Kirkwood, a neuroradiologist who provided expert

---

[4] 28 U.S.C. § 2674.

[5] Dockets 208, 209 and Notice of Errata at Docket 211.

[6] This Memorandum of Decision does not purport to recite all of the evidence submitted and arguments made by the parties. *See* Fed R. Civ. P. 52(a) Advisory Committee Note ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters. There is no necessity for over-elaboration of detail or particularization of facts.")

[7] *See* Docket 205.

testimony;  Dr. James Zirul, an ear, nose and throat doctor in Kenai who has treated Mr. Tumbaga;  Dr. Jayashree Srinivasan, a neurosurgeon who provided expert testimony by videotaped deposition;  Dr. Kevin Rullman, an osteopath who has treated Mr. Tumbaga in Kenai;  Dr. Robert O'Connell, an optometrist who has treated Mr. Tumbaga in Kenai; Jennifer Tyler, the operator of the assisted living home where Mr. Tumbaga resides;  Jill Freidman, a lifecare planner;  and Dr. Laura Taylor, an economist.

3.      The plaintiffs also submitted deposition testimony from Dr. Joshua Knappenberger, a neurologist who treated Mr. Tumbaga at the University of Washington (UW) in November 2004; Dr. John Midthun, the Chief of Radiology at ANMC in 2004; Dr. Brian Trimble, a staff neurologist at ANMC in 2004; Dr. Mark Thorndike, a vascular surgeon at ANMC in 2004; and Dr. Frances Wilson, a general surgeon at ANMC in 2004.

4.      The United States called the following witnesses:   Dr. Erik Kohler, the neurosurgeon who performed the neck surgery on Mr. Tumbaga at ANMC in October 2004;   Dr. Joe Eskridge, an interventional neuroradiologist who provided expert testimony;  Dr. Brian Trimble, a neurologist who treated Mr. Tumbaga at ANMC in 2004; Dr. Wouter Schievink, a neurosurgeon who provided expert testimony by videotaped deposition;[8]  Dr. Deborah Doherty, a doctor who specializes in physical medicine and rehabilitation who provided expert testimony;   and Dr. Robert Shavelle, a statistician who provided expert testimony on life expectancy.

---

[8] The plaintiffs also submitted excerpts from an earlier deposition of Dr. Schievink in this matter from September 2009.

5.     The United States also submitted the deposition testimony of Dennis Hopper and Harold Jopp, the two paramedics on the flight that transported Mr. Tumbaga from ANMC to the UW Hospital on November 10, 2004.   In addition, the government submitted the deposition testimony of Dr. Alvaro Testa, who was a resident physician at ANMC in November 2004.

6.     An extensive amount of exhibits was admitted into evidence, most of which consisted of Mr. Tumbaga's medical records.[9]


***The Car Accident and Mr. Tumbaga's Medical Treatment at ANMC.***

7.     Fredilito Tumbaga was severely injured in an auto accident on the Kenai Peninsula at approximately 8:30 a.m. on October 30, 2004.[10]

8.     Mr. Tumbaga was taken by helicopter from the crash site to Alaska Regional Hospital.   He arrived there at 10:43 a.m.[11]   CT scans of his brain and cervical spine were taken at that hospital.   Mr. Tumbaga suffered a very severe spine injury in the car crash – specifically, he suffered a fracture and a subluxation of the C4-5 vertebrae, meaning that the middle part of his neck was broken, his spine was out of alignment, and he had a spinal cord injury.[12]   These injuries were not caused or exacerbated by any negligence on the part of the ANMC physicians.

---

[9] *See* Docket 206.

[10] Ex. 1 at 11.

[11] Ex. 1 at 5.

[12] Ex. 1 at 17, 18; Dep. of Schievink (Feb. 27, 2012) at 13; Docket 212 at 14 (Testimony of Kirkwood); Docket 218 at 169 (Testimony of Trimble).

9.   There are two vertebral arteries, each of which runs alongside the cervical vertebrae through channels in the cervical vertebrae.  The vertebral arteries supply much of the blood to the posterior portion of the brain, including the brainstem, the cerebellum, and back portions of the cerebral hemispheres in the region of the occipital lobe.[13]

10.   When the cervical vertebrae are severely dislocated, the inner tissue of the vertebral artery may tear, which is called a dissection.  One of the risks of a vertebral artery dissection is the formation of blood clots at the site of the tear, which can then break up into emboli (small clots) and flow upward into the cerebellar arteries and cause a brainstem stroke.[14]  The type and severity of Mr. Tumbaga's spine injury has a high association with vertebral artery injury.[15]  Ischemic (i.e., stroke) symptoms frequently occur in patients who have vertebral artery dissections.  Dr. Schievink testified that of those vertebral artery dissections that he has diagnosed, about two-thirds of the patients show ischemic symptoms.[16]

11.   Both the brain and cervical CT scans taken at Alaska Regional Hospital on October 30, 2004 indicated increased density in the left vertebral artery, indicating a likely vertebral artery dissection at that time.[17]  But that is not the type of injury that

[13] Docket 212 at 12 (Testimony of Kirkwood);  Dep. of Knappenberger at 21.

[14] Dep. of Srinivasan at 17-18; Docket 212 at 24 (Testimony of Kirkwood).

[15] Docket 212 at 27 (Testimony of Kirkwood);  Dep. of Schievink (Sept. 3, 2009) at 10;  Dep. of Knappenberger at 19;  Dep. of Midthun at 15.

[16] Dep. of Schievink (Sept. 3, 2009) at 11.

[17] Docket 212 at 69 (Testimony of Kirkwood).

would have been easily discerned at that time, particularly given the overall seriousness of Mr. Tumbaga's condition.[18]  There is no evidence of a stroke on any of the October 30, 2004 studies from Alaska Regional.[19]

12.    The weight of the evidence indicates that it is more likely than not that on October 30, 2004 Mr. Tumbaga had a vertebral artery dissection to at least one, if not both of these arteries as a result of the trauma of the motor vehicle crash.[20]

13.    At approximately 12:30 p.m. on October 30, 2004, Mr. Tumbaga was transferred to ANMC, with copies of the Alaska Regional CT scans.[21]  Apparently the transfer was based on the mistaken belief at Alaska Regional Hospital that Mr. Tumbaga was an Alaskan Native.  Mr. Tumbaga was born in the Philippines and raised in Hawaii before moving to Alaska with his family several years before the car accident.

14.    Mr. Tumbaga was examined by Dr. Wilson upon his arrival at ANMC.[22]  She wrote then that he had a spinal cord injury, would be sent to the operating room, and noted "CT angio post op."[23]  At her deposition, Dr. Wilson testified that she "assumed [Mr. Tumbaga] had vertebral injury" because of "the anatomy of the vertebral arteries."[24]

---

[18] Dep. of Srinivasan at 10.

[19] Docket 212 at 69 (Testimony of Kirkwood).

[20] Dep. of Schievink (Sept. 3, 2009) at 10; Dep. of Srinivasan at 15-16.

[21] Ex.1 at 33.

[22] Docket 218 at 210 (Testimony of Trimble).

[23] Ex. 1 at 42.  The typed preoperative history and physical report that Dr. Wilson dictated on October 30 indicated that "Postoperatively, the patient will need a CT angio to rule out blunt carotid injury."  Ex. 1 at 57.  *See also* Dep. of Wilson at 22.

[24] Dep. of Wilson at 24.

She added, "when vertebrae are separated 100 percent, like his were, you just have to assume that … the vertebral arteries are sheared off."[25]

15.     Upon his arrival at ANMC, Mr. Tumbaga underwent extensive surgery to stabilize his neck fracture and take pressure off his spinal cord.[26]   Dr. Kohler performed this surgery and was not negligent in the performance of this surgery.

16.     A CT cervical scan of Mr. Tumbaga's neck was taken at ANMC on October 31, 2004, the day after his surgery.  Several images of the CT scan clearly show where a screw from the surgery has penetrated into the left transverse foramen where the left vertebral artery is located.  The placement of the screw there during surgery was not negligent.   However, the screw's location could damage the left vertebral artery.[27] There is also one image of the brain in the October 31, 2004 CT cervical scan study that shows an abnormally increased density change, or edema, in the left cerebellum area of the brain.[28]  This is more likely than not an indication that Mr. Tumbaga had suffered a stroke, which this court finds most likely occurred during or immediately after the surgery.[29]

---

[25] Dep. of Wilson at 24.

[26] Docket 218 at 170 (Testimony of Trimble).

[27] Docket 218 at 218 (Testimony of Trimble).

[28] Docket 218 at 222 (Testimony of Trimble).

[29] Docket 218 at 223 (Testimony of Trimble); Dep. of Trimble at 94;  Dep. of Srinivasan at 51.

17.     Based upon the weight of the evidence, this court finds that Mr. Tumbaga did not suffer any additional stroke until the major stroke that was diagnosed by UW on or about November 12, 2004.

18.     The radiology report for the October 31, 2004 CT scan of Mr. Tumbaga was prepared by Dr. Midthun at ANMC.  The report did not describe the misplaced screw into the vertebral canal.[30]  And it did not comment upon the increased density changes in the brain that were indicated on that CT scan showing the apparent developing ischemic stroke in the left inferior cerebellum.

19.     The radiologist's failure to identify and report the screw's placement in the foramen in the October 31, 2004 CT scan fell below the standard of care expected of a radiologist.[31]  It did not demonstrate the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances in 2004 by health care providers in the field of radiology.

20.     Dr. Kohler testified that he reviewed the October 31, 2004 CT scan himself.  At trial, he acknowledged that the threads of the screw were in the foramen.[32]  But he testified that while he would have preferred the screw not to be that close to the vertebral artery, he was not concerned with the screw's location because he determined

---

[30] Ex. A at 140;  Docket 212 at 55 (Testimony of Kirkwood).

[31] Docket 218 at 90-91 (Testimony of Eskridge).  But as noted above, the screw's placement did not constitute malpractice by Dr. Kohler in the performance of the surgery.

[32] Docket 215 at 159-160 (Testimony of Kohler).

3:06-cv-00247-SLG, *Tumbaga v. USA*
Memorandum of Decision
Page 8 of 24

that the threads of the screw were not into the vertebral artery itself and the tip of the screw is not sharp.[33]  This court found that testimony to be not credible.[34]

21.     Given the location of the screw and the nature of Mr. Tumbaga's neck injury, careful evaluation of the visible portion of the brain on that CT scan would be appropriate in light of the high association of a stroke with vertebral artery injury.  But this court was not persuaded that the failure to identify and report the abnormality in the lower part of the brain that could be seen on the October 31, 2004 CT cervical scan fell below the standard of care at that time.  The edema was visible on only one image and Dr. Trimble persuasively testified that a radiologist viewing that cervical post-operative CT scan would be focused on the surgical site at the cervical spine, and particularly seeking to make sure that the spinal cord was in proper alignment and that there was no debris in the spinal canal.[35]

22.     The vertebral artery dissection(s) that Mr. Tumbaga experienced (most likely at the time of the motor vehicle crash on October 30, 2004) was not diagnosed by any of the doctors at ANMC at any time during the twelve days he was at that facility.  Consistent with Dr. Wilson's note on Mr. Tumbaga's chart at admission, a CT angiogram was the appropriate standard of care that was ordinarily exercised for

_____

[33] Docket 215 at 77-78, 156, 157 (Testimony of Kohler).

[34] Cf. Dep. of Trimble at 93 (after viewing the image showing the screw's location, he testified that "it could damage the vertebral artery on the left.").

[35] Docket 218 at 187 (Testimony of Trimble).

Case 3:06-cv-00247-SLG   Document 219   Filed 08/07/12   Page 9 of 24

imaging a suspected vertebral artery dissection in 2004.[36]  But no CT angiogram was performed of Mr. Tumbaga's neck while he was at ANMC.  This court finds it more likely than not that a CT angiogram would have identified the injury to the left vertebral artery.  Although not established by a preponderance of the evidence, a CT angiogram at ANMC may also have identified an injury to Mr. Tumbaga's right vertebral artery which may have been responsible for the subsequent very large stroke that Mr. Tumbaga had at UW.[37]  The failure of ANMC health care providers to perform the CT angiogram on Mr. Tumbaga after the neck trauma and surgery, and particularly in light of the misplaced screw from the surgery, fell below the then applicable standard of care.

23.     This court heard some evidence that the quality of the CT angio scans at ANMC in late 2004 was not as good as at present.[38]  But as Dr. Midthun, the head of radiology at ANMC persuasively testified in his deposition, "assessing the integrity of the vessels in the neck [in 2004] was becoming more and more commonly done and wide spread."[39]  He added, "[ANMC] had at that time a CT scanner capable of doing the CT angiogram."[40]

---

[36] Docket 218 at 201, 207-208 (Testimony of Trimble); Dep. of Schievink (Sept. 3, 2009) at 20-21.   Other appropriate alternative imaging would be a conventional angiogram or MRI angiogram.  *Id.  See also* Docket 218 at 87 (Testimony of Eskridge).

[37] Dep. of Srinivasan at 20.

[38] *See* Docket 215 at 179 (Testimony of Kohler).  *Cf.* Docket 218 at 208 (Testimony of Trimble); Dep. of Midthun at 11; Dep. of Thorndike at 15; Dep. of Wilson at 27.

[39] Dep. of Midthun at 14.

[40] Dep. of Midthun at 11.

24.     Directly after the October 30, 2004 surgery, Mr. Tumbaga exhibited some, but not all, of the symptoms of a stroke.  On October 31, 2004, he had dysphagia, meaning considerable trouble swallowing, and he was hoarse, which are both symptoms consistent with a stroke.[41]  Mr. Tumbaga continues to have dysphagia and uses a tube to his stomach for nutrition.  This dysphagia was not caused by any negligence on the part of the ANMC physicians.

25.     On November 1, 2004, Mr. Tumbaga was noted to have a high-pitched voice, which is another stroke symptom.[42] Mr. Tumbaga did not exhibit other symptoms consistent with a stroke on November 1, 2004, such as jerking eye movements, vertigo, or uncoordinated movements.[43]  Dr. Trimble testified that on November 1, 2004, Mr. Tumbaga was alert, pleasant, cooperative, and able to provide a complete history to him.[44]  Mr. Tumbaga also demonstrated symptoms of spinal cord injury at that time, including a severe burning sensation in his left arm and diminished strength in his right arm.[45]

26.     A progress note dated November 2, 2004 indicates that Mr. Tumbaga was "progressing neurologically."[46]    However, there is also some evidence that Mr. Tumbaga's neurological condition deteriorated during the course of his stay at ANMC.

[41] Docket 218 at 195 (Testimony of Trimble); Dep. of Srinivasan at 15.

[42] Ex. A at 72.

[43] Docket 218 at 194-196 (Testimony of Trimble).

[44] Docket 218 at 169-173 (Testimony of Trimble);  Ex. A at 65-66.

[45] Docket 218 at 175 (Testimony of Trimble).

[46] Ex. A at 77.

On November 2, 2004, Mr. Tumbaga reported some dizziness, which is a symptom consistent with a stroke.[47]  A progress note by speech pathologist Jill Lawrence dated November 2, 2004 notes that Mr. Tumbaga exhibited a "dominance of eyes shut," "flat affect," and "zero engaging in humor initiated by wife."[48]  That note also indicates that Ms. Lawrence discussed these observations with Ms. Tumbaga.[49]  Ms. Tumbaga's testimony at trial about her communications with Ms. Lawrence regarding her concerns was similar.

27.    On November 4, 2004, Mr. Tumbaga developed intractable hiccups, which is another stroke symptom.[50]  And a progress note from November 5, 2004 indicates that Mr. Tumbaga was "still unsteady on feet,"[51] which is also consistent with a stroke.  The medical records also note that he had "impaired speech" on that date.[52]

28.    But while Mr. Tumbaga had some symptoms consistent with a stroke, he also had a constellation of other symptoms related to his spinal cord injury and neck surgery. And ANMC health care providers attributed the hiccups and other stroke-like symptoms to a vagal nerve injury and tried to manage them.

---

[47] Ex. 1 at 80.

[48] Ex A at 83.

[49] Ex A at 83.  *See also* Ex. 1 at 89.

[50] Docket 218 at 183 (Testimony of Trimble);  Ex. A at 90.

[51] Ex. 1 at 94.  *See also* Ex. A-2 at 360, UW Medicine note; Dep. of Knappenberger at 18 ("people feel very dizzy and unsteady when they have had a stroke to the brainstem.").

[52] Ex. A at 234.

29.     A cervical spine MRI study was performed on Mr. Tumbaga on November 8, 2004.[53]   An MRI can be an informative tool to help determine whether an individual is developing a stroke, but it is not a replacement for an angiogram in assessing blood flow in the vertebral arteries.[54]   The report prepared by Dr. Austin, the radiologist, regarding this MRI study stated in relevant part as follows:

> On one image (#7) there is a focal area of increased signal seen in the brainstem on the left.  This could be artifactual as well or possibly partial volume effects . . . If the patient is going to be followed up with an MR at a later date, this area could be re-examined, otherwise some additional axial and sagittal sequences through this area could be obtained.[55]

There is no evidence in the record that any such additional sequences were obtained of the brainstem area at ANMC.

30.     At trial, Dr. Kohler testified that he reviewed the MRI scan himself and interpreted this film as showing a contusion, or bruise, in Mr. Tumbaga's brain, and not a stroke.[56] Dr. Kohler testified that he believed that Mr. Tumbaga did not have a brainstem stroke while at ANMC.[57]   This court found this assertion not credible, when considered with all the other medical testimony that was presented by both the plaintiff and the defendant at trial.  Rather, this court was fully persuaded that Mr. Tumbaga suffered a brainstem stroke either during or shortly after his October 30, 2004 surgery at ANMC.   This

---

[53] Ex. 1 at 141.

[54] Docket 218 at 231 (Testimony of Trimble);  Dep. of Knappenberger at 23.

[55] Ex. A at 147.  *Cf.* Docket 218 at 83 (Testimony of Eskridge).

[56] Docket 215 at 123, 170 (Testimony of Kohler).

[57] Docket 215 at 188 (Testimony of Kohler).

brainstem stroke was not diagnosed by any of the doctors at ANMC at any time during his stay at that facility.

31.     Dr. Kirkwood testified persuasively that multiple images of the November 8, 2004 MRI study showed a stroke in both the posterior portions of the cerebellum and the brainstem, and also showed evidence of occlusion (blockage) of the left posterior inferior cerebellar artery.[58]   Specifically, the November 8 MRI showed hemorrhagic infarction in the left cerebellum of Mr. Tumbaga's brain, meaning that there were signs of bleeding in Mr. Tumbaga's brain on that date.[59]   The radiologist failed to note this condition of the cerebellum in his report, and this court finds that his failure to do so fell below the applicable standard of care for interpreting this study.

32.     With regard to the radiologist's report regarding the brainstem, Dr. Knappenberger persuasively testified at his deposition, "If I got a report that said the flow-void doesn't look good after an automobile accident and a neck injury, I would have done a non-invasive angiogram at that point."[60]   As it was, no CT angiogram or other studies were ordered at ANMC that would have permitted the accurate diagnosis of Mr. Tumbaga's brainstem stroke.

33.     This court found persuasive a progress note from November 2004 in the UW records by Dr. Knappenberger, a neurologist.  At that point, he had been provided only

---

[58] Docket 212 at 39-47 (Testimony of Kirkwood). *See also* Docket 218 at 66 (Testimony of Eskridge).

[59] Docket 212 at 73 (Testimony of Kirkwood).

[60] Dep. of Knappenberger at 27.

limited records and films from ANMC.[61]   His review of those records noted that Mr. Tumbaga had hiccups onset on November 4, 2004, dizziness, and the November 8, 2004 MRI showing increased brainstem activity.   Those symptoms led the doctor to question a "lateral medullary syndrome, which is a brainstem stroke syndrome."[62]   He concluded the symptoms "make posterior circulation damage & ischemia of great concern."[63]   He added, "as I was putting the whole history together, my concern was that he might have suffered some injury to the brainstem."[64]

34.     ANMC staff performed a Doppler study of Mr. Tumbaga on or about November 9, 2004.  That study is not appropriate for assessing either the left vertebral artery problem or the left cerebellar inferior artery, nor was it an appropriate study for those purposes in 2004.[65]

35.     Thus, based on the foregoing, this court finds that there was a negligent failure to diagnose Mr. Tumbaga's left vertebral artery dissection.  Whether there was a negligent failure to diagnose Mr. Tumbaga's brainstem stroke is a closer question.   But upon consideration of all the evidence, this court finds that the failure of ANMC health care providers to diagnose the brainstem stroke, at least by November 8, 2004, when the

_____

[61] Dep. of Knappenberger at 8-9.

[62] Dep. of Kanppenberger at 17.   *See also* Dep. of Srinivasan at 17 ("his symptoms are very consistent with something called a lateral medullary syndrome which is a stroke that … involves the vertebral artery.")

[63] Ex. A at 358, 360;  Dep. of Knappenberger at 17.

[64] Dep. of Knappenberger at 18.

[65] Docket 218 at 71 (Testimony of Eskridge); Dep. of Schievink (Sept. 3, 2009) at 23.  Ex. A at 1497; Dep. of Knappenberger at 27-28.

MRI study was conducted, fell below the applicable standard of care. Because the vertebral artery dissection(s) and brainstem stroke were not diagnosed at ANMC, Mr. Tumbaga was not treated for them at that facility. At issue is whether the failure to treat these conditions was a significant factor in causing the second stroke that Mr. Tumbaga suffered at some point soon after November 8, 2004.

36. The parties presented considerable and conflicting evidence as to whether and when Heparin should have been administered to Mr. Tumbaga after his neck surgery. They generally agreed that the decision whether to administer Heparin would be made by the surgeon who had performed the surgery – in this case, Dr. Kohler.[66]

37. Dr. Kohler testified that he planned to wait until two weeks post surgery before starting Mr. Tumbaga on Heparin. However, that decision was based on his erroneous belief that Mr. Tumbaga had not had a vertebral artery dissection or a brainstem stroke. Dr. Kohler testified that he would be administering Heparin beginning at two weeks "to protect [Mr. Tumbaga's] legs from deep venous thrombosis."[67] Because this testimony was based on the inaccurate assumptions that Mr. Tumbaga had no vertebral artery dissection or stroke, this court accords it no weight.

38. Heparin is contraindicated for a patient immediately after a recent major surgery or trauma.[68] It is a blood thinner, such that its administration may cause excessive bleeding or an inability for blood to clot.[69]

---

[66] Docket 218 at 199 (Testimony of Trimble).

[67] Docket 215 at 122(Testimony of Kohler).

[68] Dep. of Schievink (Sept. 3, 2009) at 26; Dep. of Srinivasan at 20.

39.    Dr. Eskridge testified persuasively with respect to the risks associated with the administration of intravenous Heparin more than several hours after a stroke, explaining that "you do more harm than you do good by turning it into a hemorrhagic stroke."[70] Here, Mr. Tumbaga more likely than not suffered his first stroke during or shortly after his October 30, 2004 surgery. The doctors all agreed that even if Mr. Tumbaga's brainstem stroke had been diagnosed at that time, it would not have been an option to administer Heparin to him that soon after surgery.[71]

40.    Dr. Knappenberger testified by deposition that "some physicians wait only 48 hours, and other physicians wait two weeks before they feel comfortable giving intravenous Heparin after major surgery."[72]

41.    Dr. Srinivasan testified that the standard of care is that the administration of anticoagulation therapy (i.e., Heparin) for spinal injury should begin within five days of the surgery, and that the failure to administer Heparin to Mr. Tumbaga within that specific time frame constituted a breach of the standard of care.[73]  This court was not persuaded by this testimony.  Dr. Srinivasan herself recognized that "the data in the literature is controversial" on this topic.[74]

---

[69] Dep. of Srinivasan at 55.

[70] Docket 218 at 24 (Testimony of Eskridge).

[71] Docket 218 at 27 (Testimony of Eskridge).

[72] Dep. of Knappenberger at 48.

[73] Dep. of Srinivasan at 22.

[74] Dep. of Srinivasan at 22.

3:06-cv-00247-SLG, *Tumbaga v. USA*
Memorandum of Decision
Page 17 of 24

42.    An article regarding the management of vertebral artery injuries after nonpenetrating cervical trauma that the government introduced into evidence indicates that "anticoagulation with intravenous heparin is recommended for patients with vertebral artery injury who have evidence of posterior circulation stroke."[75]    Here, Mr. Tumbaga had evidence of such a stroke, although it was not diagnosed at ANMC.  As such, Heparin therapy was recommended for him by the author of that article.  And yet, that same article also recognizes that "there is insufficient evidence to support treatment standards" or "treatment guidelines" with respect to the administration of Heparin.

43.    Dr. Eskridge testified for the government.  As noted above, he is an interventional radiologist.  One major focus of that subspecialty is the prevention of stokes.[76]    As a result, he testified that he uses Heparin in his practice "almost every day."[77]    He testified that after a stroke, Heparin is beneficial to administer only in the first few hours, but it cannot be administered intravenously at all to a person who has just had major surgery, and should not have been given to Mr. Tumbaga "in the week after his … spinal trauma and surgery."[78]    And he added that even if the ANMC doctors had diagnosed the cerebellar edema in Mr. Tumbaga in reading the November 8, 2004 MRI, he would not

---

[75] Ex. E at 1.

[76] Docket 218 at 13 (Testimony of Eskridge).

[77] Docket 218 at 16 (Testimony of Eskridge).

[78] Docket 218 at 19-20, 95 (Testimony of Eskridge).

have given Heparin to Mr. Tumbaga in that situation.[79]  This court found Dr. Eskridge's testimony on this topic persuasive.

44.    Based on all the evidence presented, this court finds that determining whether and when to administer Heparin after neck surgery is a judgment call to be made by the treating physician on a case-by-case basis, such that there is, and in 2004 there was, no applicable standard of care that requires its administration within a set number of days after surgery for purposes of this medical malpractice action.

45.    Based upon consideration of all the evidence, this court was not persuaded that if Mr. Tumbaga had been treated with Heparin beginning five days after his surgery, he would not have had the second stroke, or the second stroke would have been less severe.  In this regard, the court was persuaded by the testimony of Dr. Eskridge, as well as the November 8, 2004 MRI that demonstrated hemorrhagic activity in Mr. Tumbaga's brain.

46.    In the days immediately after the car accident and surgery, before Heparin could be safely administered, antiplatelet therapy including aspirin could have been administered to Mr. Tumbaga.[80]  Aspirin was not provided to Mr. Tumbaga at that time, presumably because of the failure to diagnose the vertebral artery dissection.  But no persuasive evidence was presented that the failure to prescribe aspirin at that time was more likely than not a substantial factor in causing the second stroke or would likely have minimized its seriousness.

---

[79] Docket 218 at 53 (Testimony of Eskridge).

[80] Dep. of Schievink (Sept. 3, 2009) at 28-30.

Case 3:06-cv-00247-SLG   Document 219   Filed 08/07/12   Page 19 of 24

47.     Mr. Tumbaga's condition worsened the last few days he was at ANMC.  He had respiratory problems and was prescribed morphine during that time.

48.     Mr. Tumbaga underwent surgery on November 9, 2004 to have the feeding tube placed into his stomach.  The evidence did not establish that this PEG surgery more likely than not was a substantial factor in causing or exacerbating the second stroke.

49.     Mr. Tumbaga was transported to UW on November 10, 2004.  Although the plan when he left Anchorage was to take him to  a rehabilitation center at that hospital, he had decreasing mental status and respiratory distress during his first day of admission and was transferred to the UW Intensive Care Unit that same day for further care.[81] The evidence did not establish that the transport of Mr. Tumbaga at that time was more likely than not a substantial factor in causing the second stroke or would likely have prevented or minimized its seriousness.   As Dr. Srinivasan testified, it is unknown whether Mr. Tumbaga would have been transported earlier, later, or at the same time if his brainstem stroke had been timely diagnosed.[82]

50.     An MRI of Mr. Tumbaga taken on November 12, 2012 at UW showed the presence of an acute massive new stroke that spread across Mr. Tumbaga's entire brain that was not present on November 8, 2012.[83]   The stroke originated on the right

---

[81] Ex. A at 341, 343.

[82] Dep. of Srinivasan at 35.

[83] Docket 212 at 48 –50 (Testimony of Kirkwood);  Dep. of Knappenberger at 33.

3:06-cv-00247-SLG, *Tumbaga v. USA*
Memorandum of Decision
Page 20 of 24

side of Mr. Tumbaga's brain and severely compressed his brain creating a life-threatening situation.[84]

51.    The second stroke most likely occurred some time after November 8, 2004, the date of the MRI at ANMC.[85]

52.    Surgery was done at UW on November 13, 2004, first to remove pressure in Mr. Tumbaga's brain, and then to remove damaged brain tissue.[86]

53.    If Mr. Tumbaga had not suffered the second stroke, he could have been a significantly more functional person.[87]   Mr. Tumbaga's spinal cord injury, together with the two strokes, has had a substantial impact both on Mr. Tumbaga's quality of life and on the lives of each of his family members.

54.    Upon careful consideration of all the evidence, this court was not persuaded by a preponderance of the evidence that the failure of ANMC health care providers to diagnose the vertebral artery dissection(s) and the brainstem stroke were substantial factors in causing or exacerbating Mr. Tumbaga's second stroke.  Given Mr. Tumbaga's fragile medical condition after his severe neck injury and subsequent surgery, the evidence at trial demonstrated that there was no applicable standard of care that would have required specified treatment had the correct diagnoses been made.

---

[84] Dep. of Knappenberger at 51; Dep. of Srinivasan at 23.

[85] Dep. of Srinivasan at 27.

[86] Dep. of Srinivasan at 52.

[87] Dep. of Wilson at 44.

### III.   CONCLUSIONS OF LAW

1.     The Federal Tort Claims Act provides that the law of the forum state applies to this claim.[88]   Alaska Statute § 09.55.540 sets out the elements for a medical malpractice claim:

> (a) In a malpractice action based on the negligence or willful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
>> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>>
>> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>>
>> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> (b) In malpractice actions there is no presumption of negligence on the part of the defendant.

2.     Under Alaska law, in order to find that a plaintiff is entitled to recover, the court must find that it is more likely true than not true that:

(a)      The defendant was negligent;

(b)      The plaintiff was harmed; and

(c)      The defendant's negligence was a substantial factor in causing the plaintiff's harm.[89]

---

[88] 28 U.S.C. § 2674.

[89] Alaska Pattern Jury Instruction 3.01.

3:06-cv-00247-SLG, *Tumbaga v. USA*
Memorandum of Decision
Page 22 of 24

3.    Negligence is a substantial factor in causing harm if:

(a)    The harm would not have occurred without the negligence; and

(b)    The negligence was important enough in causing the harm that a reasonable person would hold the negligent person responsible.[90]

4.    Subsection (a) of paragraph (3) above does not apply if two events operated to cause the harm, one because of the defendant's negligence and the other not, and each event by itself was sufficient to cause the harm. [91]

5.    Based on the Findings of Fact set forth above, the plaintiffs have established by a preponderance of the evidence that the ANMC physicians failed to exercise the degree of care ordinarily exercised under the circumstances when they failed to diagnose Mr. Tumbaga's vertebral artery dissection() and brainstem stroke.

6.    Based on the Findings of Fact set forth above, the plaintiffs have not established by a preponderance of the evidence that the standard of care for the treatment of a vertebral artery dissection and stroke after neck surgery necessitates the use of anti-coagulant therapy such as Heparin within a specified number of days post-surgery.

7.     The plaintiffs have not established by a preponderance of the evidence that had Mr. Tumbaga been treated with anticoagulant therapy such as Heparin beginning five days of his surgery, he would, on a more likely than not basis, not have had the second stroke, or the second stroke would have been less severe.

---

[90] Alaska Pattern Jury Instruction 3.07.

[91] Alaska Pattern Jury Instruction 3.07.

3:06-cv-00247-SLG, *Tumbaga v. USA*
Memorandum of Decision
Page 23 of 24

8.     Based on the findings of fact described above, the plaintiffs have not established by a preponderance of the evidence that the negligent failure of the physicians at ANMC to exercise the requisite degree of care in the diagnosis of Mr. Tumbaga's conditions was a substantial factor in causing the second stroke or in exacerbating its severity. [92]

9.     The Alaska Supreme Court has not determined whether the loss of chance doctrine applies under Alaska's current medical malpractice statute.  In a recent Order dated January 27, 2012, the Alaska Supreme Court dismissed a petition for review on this topic, and indicated that "the Court is evenly divided on the question whether the loss-of-chance doctrine is consistent with Alaska law."[93]  But as the plaintiffs have not proven that a decision not to administer Heparin to Mr. Tumbaga would have been negligent had the vertebral artery dissection(s) and brainstem stroke been timely diagnosed, the doctrine would be inapplicable in this particular case even if recognized in Alaska.

## IV.   CONCLUSION

For the foregoing reasons, this court finds and concludes that judgment shall be entered for the defendant.

Dated this 7th day of August, 2012.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[92] *See Vincent v. Fairbanks Memorial Hospital*, 862 P.2d 847 (Alaska 1993) (affirming jury verdict in which jury found that patient had received negligent medical care, but also found that such care was not the legal cause of the patient's permanent brain injury).

[93] *Dobbins v. Providence Alaska Medical Center*, No. S-13334, slip op. at 1  (Alaska Jan. 27, 2012) (Order Dismissing Petition).

Case 3:06-cv-00247-SLG   Document 219   Filed 08/07/12   Page 24 of 24